779 So.2d 763 (2000)
STATE of Louisiana, Appellee,
v.
Roger Dale CLEM, Appellant.
No. 33,686-KA.
Court of Appeal of Louisiana, Second Circuit.
November 1, 2000.
*764 J. Wilson Rambo, Louisiana Appellate Project, Monroe, Counsel for Appellant.
Richard Ieyoub, Attorney General, James D. Caldwell, District Attorney, James E. Paxton, Assistant District Attorney, Counsel for Appellee.
Before NORRIS, GASKINS and DREW, JJ.
GASKINS, J.
The defendant, Roger Dale Clem, was initially indicted for first degree murder but the charge was subsequently amended to second degree murder. Following a jury trial, he was convicted as charged and sentenced to life imprisonment without benefit of parole, probation or suspension of sentence. He now appeals. The defendant's conviction and sentence are affirmed.

FACTS
On the night of September 9, 1995, the body of Dr. John "Doc" Monsell, a 75-year-old veterinarian, was found in his rural Tensas Parish home. He had been beaten about the head with a blunt object and then shot once in the head. The body was discovered by a local deputy sheriff who had been notified by the police in Vicksburg, Mississippi, that a convicted felon was in their custody for possession of firearms belonging to the doctor. The convicted felon was the defendant, a handyman who worked for the victim and lived at his home. In addition to several of the victim's firearms, one of which was ultimately determined to be the murder weapon, the defendant also had possession of the victim's truck and wallet.
Subsequent investigation revealed that the victim had last been seen alive by his neighbors at about 11 a.m. that morning. At about 2:30 p.m., the defendant stopped by the neighbors' house in the victim's *765 truck. He had a puppy with him. He told the neighbors that Dr. Monsell had gone out of town with a friend, Mr. Arender. (However, at trial, Mr. Arender testified that he last saw the victim on September 8, the day before he died.) The neighbors did not observe any indication that the defendant was intoxicated.
At about 3 p.m., the defendant was seen at a bar. He "hollered out" an inquiry as to whether anyone knew Dr. Monsell. A bar patron who was familiar with both the victim and the defendant replied that the defendant should know the doctor since he worked for him. The patron also noticed a puppy with a bowl of water in the bar.
Shortly thereafter, Herman Ghrigsby who was en route to the victim's residence to look at some horsessaw the defendant on the side of the road in the victim's truck, which had broken down. While the defendant did not appear intoxicated, he seemed "more excited than normal." Mr. Ghrigsby, who was accompanied by two relatives, recognized the puppy with the defendant as the blue heeler he had recently given to the victim as a cattle dog. The defendant recounted to them that the doctor was not at home, having gone out of town. After Mr. Ghrigsby helped repair the truck, he remarked to his relatives that "something was not right"; he went home and retrieved his pistol before going to the victim's house. Mr. Ghrigsby and his relatives then went to the victim's property and looked at the horses. They did not see the victim or attempt to enter the house.
The victim's truck broke down again on I-20 on the Louisiana side of the Mississippi River bridge. At 4:48 p.m., the defendant purchased a ticket for Jackson, Mississippi, at the Vicksburg bus terminal. (A bus to Jackson had left at 4 p.m. and the next one departed at 9 p.m.) At 5:22 p.m., he checked into a Vicksburg motel and called for a tow truck. According to the tow truck driver, the defendant smelled of beer when he picked him up at the motel; however, he did not appear to be drunk. When they arrived at the truck's location, the puppy was still in the cab. The driver also noticed several firearms under a tarp in the bed of the truck. They towed the truck back to the motel, arriving at about 6:30 p.m. The defendant attempted to pay the driver twice and gifted him with a shotgun.
At this point, the defendant attempted to sell several of the firearms in the truck bed in the motel parking lot. An alarmed motel employee called the police. When the first officer arrived on the scene at about 7:05 p.m., the defendant was holding a rifle with a scope. He obeyed the officer's command to put the weapon down and place his hands on the truck. He responded affirmatively when the officer asked if he had other weapons. The officer retrieved a pistol from the center of his back waist band; this was subsequently determined to be the weapon used to kill the victim. When asked if he had any other weapons, the defendant reached toward the front of his waistband where he had another pistol. A brief scuffle ensued between the defendant and the officer during which the officer knocked this gun from the defendant's hand. The officer noticed a slight smell of alcohol about the defendant but he did not appear to be intoxicated.
The defendant admitted that he was a convicted felon on parole from Florida. He initially claimed to own the truck and the firearms. The police, however, discovered that the vehicle was registered to Dr. Monsell and found his wallet in the truck. The defendant then stated that he had borrowed the truck from Dr. Monsell, who would return from a trip in a few days and verify the loan of the vehicle. The police dispatcher's attempts to reach Dr. Monsell by telephone were unsuccessful.
The defendant was arrested as a convicted felon in possession of a firearm. The truck was towed by the same company which had retrieved it earlier that same *766 day. The tow truck driver subsequently handed over to the police the shotgun given to him by the defendant.
Unable to reach Dr. Monsell, the Vicksburg police contacted the Madison Parish sheriff's office and explained the situation to a deputy sheriff. The deputy immediately went to Dr. Monsell's residence where, shortly before 10 p.m., he discovered the veterinarian's body. Notified of the homicide, the Vicksburg police carefully examined the defendant's clothing. They discovered blood stains on the tee-shirt which DNA testing later established as belonging to the victim.
Louisiana law enforcement authorities went to Vicksburg. At about 1:30 a.m. on September 10, 1995, they questioned the defendant, who claimed that he had come to Mississippi to obtain parts for the truck he was driving. He again asserted that he had last seen the victim at noon that day when Dr. Monsell left on a trip with a friend, Mr. Arender. After being informed that the victim was dead, the defendant invoked his right to counsel, and questioning was halted.
The defendant was returned to Louisiana, where he was indicted for first degree murder. Prior to trial, the charge was amended to second degree murder. Although at some point the defendant entered a plea of not guilty by reason of insanity, he amended his plea to not guilty before trial commenced. A jury convicted him as charged, and the mandatory sentence of life imprisonment without benefit of parole, probation or suspension of sentence was imposed.
On appeal, the defendant asserts 11 assignments of error. Two assignments were not briefed and are consequently deemed abandoned. URCA Rule 2-12.4; State v. Schwartz, 354 So.2d 1332 (La. 1978); State v. Kotwitz, 549 So.2d 351 (La.App. 2d Cir.1989), writs denied, 558 So.2d 1123 (La.1990). The remaining assignments present three basic arguments.

CAPACITY TO PROCEED
The first issue presented by the defendant contends that the trial court erred in failing to dispose of the defendant's motion pertaining to his capacity to proceed and to assist counsel at trial.[1]
Pursuant to a sanity commission, the defendant was examined in late 1995 by two doctors, Dr. Joseph R. Whitaker and Dr. James R. Waddill. Dr. Whitaker found no evidence of present or former mental illness; he also concluded that the defendant was mentally competent at the time of the offense and was competent to aid in his defense. Likewise, Dr. Waddill opined that the defendant had no current mental disease or defect, was sane at the time of the offense, and was capable of aiding in his defense. The minute entries indicate that on December 14, 1995, the trial court considered the report of the sanity commission and found that the defendant was capable of assisting in his defense.
In October 1997, the defense filed a motion, which by its caption, sought appointment of a psychiatrist to determine the defendant's competency to assist counsel and his mental condition at the time of the offense. By means of this motion, the defense secured the appointment of Dr. Hyman H. Eisenstein, a clinical psychologist from Florida. In December 1998, the defense filed an ex parte motion to have the Louisiana Indigent Defender Assistance Board pay for the services of Dr. Eisenstein and Dr. Esther Selevan, a psychologist. According to the motion, these psychologists had examined the defendant at the request of defense counsel and their services were needed to prepare his defense. The motion was granted.
In March 1999, defense counsel filed a motion seeking to compel the Louisiana Indigent Defender Assistance Board to pay for an MRI on the defendant. The order was granted. In May 1999, defense *767 counsel filed an ex parte motion to have Dr. N.L. Mauroner, a psychiatrist, appointed to examine the defendant. According to the motion, defense counsel had tried to have an MRI conducted on the defendant at the suggestion of Dr. Eisenstein. (The defendant told Dr. Eisenstein that he had suffered a closed head injury in a car accident in the 1970's.) However, the LSU Medical System was reluctant to conduct the MRI without the orders of a doctor known to their system and refused to accept the recommendations of Dr. Eisenstein and Dr. Whitaker. Thus, the defense requested the appointment of Dr. Mauroner, who was familiar with the LSU Medical System and capable of obtaining an MRI on the defendant if warranted. The motion was granted.
In his report, Dr. Mauroner concurred with the prior findings of the other doctors that the defendant was capable of aiding in his defense and that he was able to distinguish between right and wrong at the time of the offense. While noting the defendant's claim of memory loss as to the details of the offense, the doctor felt his "overall production" did not substantiate that claim. Furthermore, Dr. Mauroner informed the court that he had advised defense counsel of the costs and availability of MRI procedures at LSUMC and Central Louisiana State Hospital.
The defendant went to trial on a plea of not guilty, obviously choosing not to pursue the plea of not guilty by reason of insanity. No evidence of insanity was presented at trial by the defense. Following his conviction, the defendant filed in this court a motion to remand the case to the lower court, contending that the issue of his capacity to proceed to trial was never addressed in a hearing before the trial court. We denied the motion to remand on the basis that the minute entry of December 14, 1995 found the defendant capable of assisting counsel. However, we stated that the issue could be argued on appeal.
La.C.Cr.P. art. 642 provides:
The defendant's mental incapacity to proceed may be raised at any time by the defense, the district attorney, or the court. When the question of the defendant's mental incapacity to proceed is raised, there shall be no further steps in the criminal prosecution, except the institution of prosecution, until the defendant is found to have the mental capacity to proceed.
In pertinent part, La.C.Cr.P. art. 647 states that: "The issue of the defendant's mental capacity to proceed shall be determined by the court in a contradictory hearing." The criminal prosecution shall be resumed unless the court determines by clear and convincing evidence that the defendant does not have the mental capacity to proceed. La.C.Cr.P. art. 648(A).
The defendant contends that the trial court erred in not conducting an evidentiary hearing on the original sanity commission motion or the subsequent motion involving Dr. Mauroner. Consequently, he claims that his conviction and sentence are null and void. In support of his position, he cites several cases, most notably State v. Nomey, 613 So.2d 157 (La.1993), and State v. Carney, 25,518 (La.App.2d Cir.10/13/95), 663 So.2d 470. However, we find that these cases are distinguishable from the present situation.
In the Nomey case, members of a court-appointed sanity commission examined the defendant; the next day, the trial court accepted the defendant's guilty pleas. At that time, the doctors' reports were not even available to the court. As a result, the issue of the defendant's capacity to proceed was not resolved prior to the taking of further steps in the prosecution. The Carney case involved a motion for appointment of a sanity commission filed by the defense. Defense counsel withdrew the motion at a proceeding held outside of the defendant's presence. The withdrawal was accepted by the trial court, and the case proceeded to trial at which the defendant was convicted. The appellate court *768 concluded that at the very least, the trial court should have personally observed the defendant and questioned him about his understanding of the proceedings to determine his mental capacity. Furthermore, the court found that an attorney independently waiving or withdrawing the motion was an insufficient resolution of the issue, and the trial courtnot defense counsel was mandated to determine the defendant's mental capacity to proceed.
Thus, the important issue here was not whether the trial court conducted a contradictory hearing, but whether the trial court resolved the issue of the defendant's capacity to proceed. In the instant case, the trial courtwith the benefit of the reports of the sanity commission members, Dr. Whitaker and Dr. Waddilldecisively resolved the issue, concluding that the defendant had the capacity to assist in his defense. The minutes do not establish that a contradictory hearing was held; nor do they show that the defense objected to the failure to conduct a full hearing. The failure to conduct the hearing was harmless. See State v. Narcisse, 426 So.2d 118 (La.1983), cert. denied, 464 U.S. 865, 104 S.Ct. 202, 78 L.Ed.2d 176 (1983), and State v. Wry, 591 So.2d 774 (La.App. 2d Cir. 1991).
Dr. Eisenstein and Dr. Mauroner were not appointed as a sanity commission, but as expert witnesses hired by the defense. Moreover, defense counsel never moved for or requested a hearing or objected to the lack thereof on the need to appoint a second sanity commission prior to trial; thus, any objections were waived. See State v. Gowan, 96-0488 (La.3/29/96), 670 So.2d 1222; State v. Dugas, 96-49 (La. App. 3rd Cir. 10/9/96), 683 So.2d 1253, writ denied, 96-2652 (La.4/4/97), 692 So.2d 417; and State v. Barnett, 96-2050 (La.App. 1st Cir. 9/23/97), 700 So.2d 1005. Further, the report of Dr. Mauroner states that the defendant was capable of aiding his defense at trial.
This assignment of error is meritless.

COMMENT BY PROSECUTOR
In four assignments of error, the defendant complains of an allegedly prejudicial comment made by the prosecutor during re-direct examination of the defendant's brother, a prosecution witness.
On direct examination, Randy Clem testified that he spoke with the defendant on the telephone while his brother was in jail for Dr. Monsell's murder. He asked the defendant, "Did you do it?" The defendant responded, "Yeah." After a brief pause, Randy Clem asked the defendant why he had done it. In response, the defendant said, "Don't worry it." He then told his brother that he would "just tell... them he blacked out and he'll get out of it."
Regarding these conversations, on redirect examination, the prosecutor asked Randy Clem:
"Were you made aware thatthat he was going to try to say that he was crazy and he didn't know what he was doing?"
Defense counsel objected and moved for a mistrial. The motion was denied, and the prosecutor was instructed to limit reference to the testimony in the record, that is, that the defendant said he "blacked out."
The defendant claimed at trial that he did not remember much about the events of September 9, 1995. He testified that he was sure that he was drinking that day. Counsel asked if he recalled his encounters with each of the various persons who testified that they had spoken to or seen the defendant on the day of the murder. In each case, the defendant said he did not recall. He testified that he and his brother did not get along well and contended that Randy was jealous of his relationship with his mother.
The defendant argues that the prosecutor's remark is tantamount to an expressed personal belief by the prosecutor that the defense was a farce. He claims *769 that this expression of belief impermissibly invaded the province of the jury in assessing the defense.
In relevant part, La.C.Cr.P. art. 775 states:
Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.
The defendant does not argue any grounds for mistrial authorized under La.C.Cr.P. arts. 770 or 771, although arguably art. 771(1)which pertains in part to comments by a district attorneyis applicable. Mistrial is a drastic remedy which is warranted only when substantial prejudice would otherwise result to the accused. State v. Jones, 31,613 (La.App.2d Cir.4/1/99), 733 So.2d 127, writ denied, 99-1185 (La.10/1/99), 748 So.2d 434. The trial court has the discretion to determine whether a fair trial is impossible or whether a jury admonition is adequate to assure a fair trial when alleged misconduct does not fit into the provisions for a mandatory mistrial, and the ruling will not be disturbed absent an abuse of discretion. State v. Jones, supra.
In State v. Williams, 26,655 (La.App.2d Cir.3/1/95), 651 So.2d 331, writ denied, 95-0777 (La.9/15/95), 660 So.2d 448, the prosecutor made a facetious remark while questioning the defendant that might be construed to indicate that the prosecutor thought the defendant was guilty. As an alternate possible response to a question, the prosecutor said to the defendant: "Or could it be that I believe the charges are true also, couldn't it?" At this point, the defense objected and the trial court sustained the objection. Williams then moved for a mistrial on the grounds that it was improper for the prosecutor to state his opinion. La.C.Cr.P. art. 771(1). While the trial court agreed that it was improper and found the entire line of questioning irrelevant, the court in its discretion did not feel it necessary to order a mistrial, and denied Williams' motion. The court instructed the prosecutor to cease this line of questioning, and he complied. At no time did Williams ask for an admonition to the jury. We affirmed the trial court's ruling on the matter, reiterating that the court found that the prosecutor's remark though perhaps inappropriatedid not substantially prejudice Williams so as to deny him a fair trial and thus warrant a mistrial.
Similarly, in this instance, the question by the prosecutor, while arguably inappropriate, did not rise to the level of creating such prejudice so as to require a mistrial. Consequently, we find that these assignments have no merit.

SENTENCE
In four assignments of error, the defendant attacks the sentence of life imprisonment without benefit of parole, probation or suspension of sentence imposed by the trial court. Specifically, he asserts that the sentence is excessive, the trial court failed to comply with La.C.Cr.P. art. 894.1, the defendant was erroneously deprived of "good time," and the trial court failed to order a pre-sentence investigation (PSI) report in order to help with its sentencing decision.

Excessiveness and noncompliance with La.C.Cr.P. art. 894.1
The defendant complains that his life sentence is constitutionally excessive even though it is a statutorily mandated sentence. He contends that even a sentence within statutory limits may constitute excessive punishment and is subject to appellate review and modification. He also asserts that the trial court failed to specify the sentencing considerations under La. C.Cr.P. art. 894.1 used in imposing sentence and therefore the case must be remanded for re-sentencing.
The defendant was convicted of second degree murder, a violation of La. *770 R.S. 14:30.1, which carries a mandatory sentence of life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence. It is within the legislature's authority to determine the length of the sentence imposed for crimes classified as felonies, and the courts are charged with applying these punishments unless they are found to be unconstitutional. State v. Armstrong, 32,279 (La.App.2d Cir.9/22/99), 743 So.2d 284, writ denied, XXXX-XXXX (La.4/7/00), 759 So.2d 92. The decision to assess mandatory life sentences is within the prerogative of the legislature. State v. Armstrong, supra. The assertion that the mandatory life sentence for second degree murder is a violation of the prohibition against excessive punishment in the Louisiana Constitution has been repeatedly rejected. State v. Armstrong, supra; State v. Ruffins, 32,870 (La.App.2d Cir.12/10/99), 748 So.2d 614; State v. Davis, 31,711 (La.App.2d Cir.3/31/99), 732 So.2d 612, writ denied, 99-3114 (La.5/5/00), 761 So.2d 539.
In addition, the defendant has failed to show by clear and convincing evidence that his particular circumstances are an exception to the constitutional application of this mandatory sentence. State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672. The sentence of life imprisonment without benefit of parole, probation, or suspension of sentence in the present case does not shock the sense of justice in light of the crime committed and the likely risk of harm to others by the defendant.
Further, failing to articulate reasons for sentence under La.C.Cr.P. art. 894.1 when imposing a mandatory life sentence is not error. In such circumstances, setting forth the factors considered in imposing sentence would be an exercise in futility since the court has no discretion. State v. Armstrong, supra; State v. Rice, 31,871 (La.App.2d Cir.3/31/99), 736 So.2d 956, writ denied, 99-1314 (La.10/15/99), 748 So.2d 464; State v. Koon, 31,177 (La. App.2d Cir.2/24/99), 730 So.2d 503; State v. Rose, 606 So.2d 845 (La.App. 2d Cir. 1992).
These arguments are without merit.

"Good Time"
The defendant also contends that the trial court erred in denying him the ability to earn "good time" under La. R.S. 15:571.3. However, a person convicted of second degree murder may not earn a diminution of his sentence under the "good time" provisions. In pertinent part, La. R.S. 15:571.3 states:
C. Diminution of sentence shall not be allowed an inmate in the custody of the Department of Public Safety and Corrections if:
(1) The inmate has been convicted one or more times under the laws of this state of any one or more of the following crimes:
. . .
(b) Second degree murder.
This assignment of error is without merit.

PSI report
The defendant contends that the trial court erred in not ordering and utilizing a PSI report in fashioning his sentence. However, in State v. Armstrong, supra, we held that the court's failure to order a PSI report in a second degree murder case was not error. As in the instant case, the defendant contended that the trial court erred in failing to order a PSI report in order to obtain more information from collateral sources about him and thus make a fully informed decision regarding his sentence. A PSI report may be ordered by the court but is not a right of the accused and is not mandatory. La. C.Cr.P. art. 875; State v. Wimberly, 414 So.2d 666 (La.1982); State v. Alexander, 97-169 (La.App. 3d Cir.6/4/97), 696 So.2d 171, writ denied, 97-1803 (La.12/12/97), 704 So.2d 1199.
Accordingly, this assignment is also without merit.

*771 ERROR PATENT
Our error patent review disclosed that the trial court correctly informed the defendant the prescriptive period for postconviction relief is "three years" from the date the judgment of conviction and sentence becomes final. However, due to the amendment of La.C.Cr.P. art. 930.8 by Acts 1999, No.1262, the prescriptive period is now two years. Because this amendment affects the defendant, we direct the trial court, within 30 days from the rendition of this opinion, to provide him with notice of La.C.Cr.P. art. 930.8 as amended and to file proof of receipt of the notice into the record. State v. Lane, 33,059 (La.App.2d Cir.3/3/00), 755 So.2d 368; State v. Butler, 33,403 (La.App.2d Cir.5/10/00), 760 So.2d 620.

CONCLUSION
The defendant's conviction and sentence are affirmed.
AFFIRMED.
NORRIS, J., concurs.
NOTES
[1] Appellate counsel did not represent the defendant at trial.